Charles C. FINN and George C. Finn,
Appellants,

v.

UNITED STATES of America,
Appellee.

No. 14479.

United States Court of Appeals,
Ninth Circuit.

Jan. 7, 1955.

On Petition for Rehearing
March 7, 1955.

On Motions to Withdraw Mandate and
to Vacate Order March 8, 1955.

Writ of Certiorari Denied
April 11, 1955.

See 75 S.Ct. 583.

Bernard B. Cohen, Henry S. Cohen, Los Angeles, Cal., Charles C. Finn, George C. Finn, Hollywood, Cal., in pro. per., for appellants.

Laughlin E. Waters, U. S. Atty., Manley J. Bowler, Richard A. Lavine, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS and CHAMBERS, Circuit Judges, and McLAUGHLIN, District Judge.

CHAMBERS, Circuit Judge.

The defendants were the subjects of a two count indictment in the United States District Court for the Southern District of California, Central Division.

Count one reads as follows:

"(1) That continuously from on or about July 31, 1953, to and including the date of the filing of this indictment, Laughlin E. Waters was and is the duly appointed, qualified, and acting United States Attorney for the Southern District of California and in such capacity was and is charged with the performance of the official duties of such office, including those duties set forth in United States Code, Title 28, Section 507, and at all times herein mentioned had entered upon and was engaged in the performance of said official duties.

"(2) That commencing on or about the early part of the month of September, 1953, and continuing until on or about January 21, 1954, the defendants GEORGE C. FINN and CHARLES C. FINN, in the Southern District of California, in the State of California and in other places to the grand jury unknown, did unlawfully, wilfully, and knowingly conspire and agree with each other and with other persons to the grand jury unknown to violate the provisions of Section 372 of Title 18 of the United States Code in that the defendants and their co-conspirators did wilfully and knowingly conspire to prevent by force, intimidation, and threats the said United States Attorney Laughlin E. Waters from discharging his official duties as such United States Attorney.

"(3) That it was a part of said conspiracy that said defendants and their co-conspirators would by force, intimidation, and threats arrest and cause the arrest of said Laughlin E. Waters without a warrant of arrest or any other lawful process and would detain, restrain, and deprive said Laughlin of his liberty, all for the purpose of thereby perventing said Laughlin E. Waters from performing and discharging his official duties as said United States Attorney.

"(4) That in the furtherance of said conspiracy and to effect the object thereof the said defendants on or about January 21, 1954, in the City of Los Angeles, State of California, did forcibly and unlawfully arrest, detain, and restrain the said United States Attorney Laughlin E. Waters without warrant of arrest or any other legal process."

The foregoing count charges an offense under 18 U.S.C. § 372 which is:

"Conspiracy to impede or injure officer

"If two or more persons in any State, Territory, Possession, or District conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof, or to induce by like means any officer of the United States to leave the place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties, each of such persons shall be fined not more than $5,000 or imprisoned not more than six years, or both."

Count two said:

"(1) That continuously from on or about July 31, 1953, to and including the date of the filing of this indictment Laughlin E. Waters was and is the duly appointed, qualified, and acting United States Attorney for the Southern District of California and in such capacity was

and is such a person as designated in United States Code, Title 18, Section 1114.

"(2) That on or about January 21, 1954, within the City of Los Angeles, California, and the jurisdiction of this court, the defendants GEORGE C. FINN and CHARLES C. FINN knowingly, wilfully, and unlawfully did forcibly impede, intimidate, and interfere with said Laughlin E. Waters, United States Attorney, as aforesaid, on account of the performance of said Laughlin E. Waters' official duties as the said United States Attorney."

The second count charges an offense under 18 U.S.C. § 111 which is as follows:

"Assaulting, resisting, or impeding certain officers or employees

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

"Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

Here it should be pointed out that there is no crime of false arrest per se in the United States Code and there is no suggestion that there was any personation by the defendants of federal officers.[1]

After an extended jury trial both defendants were convicted on each count. Each was sentenced to one year of imprisonment on each count, the sentences to run concurrently.

The incident resulting in the indictment was a bizarre one. While leaving a bar association luncheon at the Biltmore Hotel in Los Angeles shortly after noon on Thursday, January 21, 1954, Laughlin E. Waters, United States District Attorney for the Southern District of California was stopped by the defendants, informed that he had violated the civil rights of the defendants, and that they were making a citizens' arrest of him. They had a sheaf of papers with them which they exhibited to him, and perhaps read extracts therefrom, but Waters did not read the papers. As part of the so-called "arrest" they handcuffed him to one of the brother-defendants and took him to the Los Angeles central police station in a police van which one brother summoned after the "arrest". They failed to get the police to book Waters or to incarcerate him. No complaint was issued against Waters by anyone in authority and none was sought prior to the incident. It is reasonable to say that in the events Waters did not resist forcibly. But he did not acquiesce. The defendants brought along for the incident a photographer and a radio broadcaster. It should be said that during the outrage, which it was, the district attorney comported himself with dignity. The events created by defendants took up most of the afternoon and Waters reached his office about 4:30 P.M., the defendants having gone with police officials and Waters to the district attorney's office of Los Angeles County from the police station. There the defendants themselves ended up arrested.

The background for the "arrest" is to be found in a controversy with the government of the United States over a surplus war airplane sold by the government to a California school district and by it resold to the Finn brothers. In that controversy, agents of the government, asserting that the sale made to the Finns was invalid, caused or induced the then United States Attorney, Waters' predecessor, to institute proceedings in July, 1952 to take the plane from the Finns. The United States Marshal then seized the plane. An order had been entered on

---

1. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210, indicates the "arrest" here would have to be justified under California state law. See also Cyclopedia of Federal Procedure (3d Ed.) 140, Section 4028 and Symons v. United States, 9 Cir., 178 F.2d 615.

January 3, 1953 by Judge Harry C. Westover of the United States District Court for the Southern District of California restraining these defendants and others from interfering with the plane. It is doubtful if this order had been personally served on the Finns.

However, the defendants, after entry of the order, had seized the plane at a California air field and one removed it to an abandoned air strip in Nevada. There someone, in behalf of the government, took the plane to Nellis Air Force Base, Las Vegas, Nevada. Presumably someone purporting to act for the government still has the plane there. The reseizure by the Finns resulted in their being cited for contempt before Judge Westover. Upon a hearing, he held the original taking of the plane by the government so defective in statutory compliance that there was no contempt in the taking of the plane by the Finns. At the time of the trial of this criminal case for their "arrest" of Waters, it appeared that Judge Westover's civil order of restraint had never been dissolved but the defendants say they thought at the time they "arrested" Waters that the import of the Westover opinion on the contempt citation was that the restraining order had been dissolved.

Waters was not the United States Attorney at the time the government seized the Finns' plane and he had nothing to do with the issuance of the restraining order. He assumed office July 31, 1953, some four months after Judge Westover heard the contempt proceedings.

Subsequent to the retaking event the defendants had attempted to get Waters to prosecute an assistant United States marshal and several others for incidents in connection with the litigation involving the plane in question and a government plane the defendants had attached in a state court proceeding. On one or more occasions after July 31, 1953, Waters in response to demands of the Finns had told them in effect that as United States attorney, pursuant to court order, he held the disputed plane.

There is no suggestion or suspicion anywhere in the record that Waters actually committed any crime, felony or misdemeanor, and it is not now argued that he did. Nor can it now be argued successfully on the evidence here that someone else had committed a felony and that the Finns had reasonable ground to believe Waters committed it, because there is no showing of anyone having committed a felony. But the Finns defend on the ground that they thought when they "arrested" Waters he had violated their civil rights; that specifically they thought he had violated Sections 241, 242 and 372 of Title 18 of the United States Code; and that having honestly thought so they lacked the specific requisite "intent" to be guilty of the offenses with which they are charged.

It is to be pointed out that the trial court almost without restriction let the defendants testify as to what they "thought". However, the pattern of its rulings was generally to exclude documents, papers and statements of others made to the Finns that would have tended to show how they happened to think the way they said they thought. Such collateral matter is ordinarily inadmissible and wisely so.

Essentially the defendants defended their conduct on the ground that ignorance and bad information as to what the law is constitute an excuse for them. They rely on such cases as Buchanan v. United States, 8 Cir., 233 F. 257, (a mistake as to title to land), Miller v. U. S., 10 Cir., 120 F.2d 968, (a mining fraud case), and United States v. One Buick Coach Automobile, D.C., 34 F.2d 318 (lack of knowledge that a revenue tax was due). There is a field of cases, and perhaps the field is growing where ignorance of the law does negate the existence of the right kind of intent, but crimes of the sort here charged have the requisite intent if the defendants intended the natural consequences of

their acts.[2] Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 51 L.Ed. 1047, and Cleveland v. United States, 10 Cir., 146 F.2d 730.[3] See Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, 358, where it is said, "It is only in very few criminal cases that 'wilful' means 'done with a bad purpose.' Generally, it means 'no more than that the person charged with a duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law'". Also, where a criminal statute itself uses the word "wilful" one is more apt to have a chance of introducing evidence of ignorance of the consequences of one's act. Haigler v. United States, 10 Cir., 172 F.2d 986. The statutes under which the Finns were indicted do not contain the word "wilful". The indictment uses the word "wilfully" several times. That does not transport the case from one rule of law to another and here should be taken as meaning no more than "intentionally".

The defendants were permitted to testify at great length about their civil litigation over the airplane. They were permitted to tell about their repeated vists to Waters' office and all that transpired there between the time of Waters' appointment and his arrest. They told of their efforts to get Waters to arrest this and that person. In rebuttal Waters revealed the obscene lengths to which one of the defendants went—which was not denied.

Of course, in a criminal case a jury has the power to fly in the teeth of the evidence and the law and acquit a defendant; that is something that cannot be taken away from it. Bushell's Case, 124 Eng.Rep. 1006.[4] Were this a civil false arrest case, the facts are so strong that a trial judge probably would have been justified in directing a jury to return a verdict for the plaintiff.

The appellants Finn make 24 specifications of error. All but five concern instructions given or refused the jury.

Some prefatory comment is desirable. As hereinabove indicated, the defense was predicated on a contention that the defendants made a mistake of law and specifically that the mistake of law was in thinking they had a right to arrest Waters under Sec. 837 of the California Penal Code which reads as follows:

"Arrests by private persons: (Circumstances authorizing).

"A private person may arrest another:

"(1) For a public offense committed or attempted in his presence.

"(2) When the person arrested has committed a felony, although not in his presence.

"(3) When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it."

Having made the mistake of law, they say this negated intent to interfere with performance of Waters' duties. Let's test that proposition with a few illustrations. Suppose a cotton farmer thinks an acreage limitation placed upon him is unconstitutional. Fancying, therefore, that the President, through the Secretary of Agriculture in carrying out the farm program enacted by Congress was committing a felony, this cotton farmer places handcuffs on the President and hauls him off to a common jail. Maybe another thinks the United States Supreme Court is taking too long to decide a case and that such delay is a felony. The individual takes the law into his own hands. He clamps handcuffs on a justice of the Supreme Court. How long would a trial court have to listen to the defendant testify that he made a mistake of law in making the arrests. Would he be permitted to testify, or bring his friends

---

2. Also, at the other extreme, we have more and more misdemeanors in the nature of police regulations where no intent at all is required. For an exhaustive discussion of "intent", see Mr. Justice Jackson's opinion in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L. Ed. 288.

3. Affirmed, 329 U.S. 14, 67 S.Ct. 13, 91 L. Ed. 12.

4. See also Morris v. United States, 9 Cir., 156 F.2d 525, 169 A.L.R. 305.

to testify, that he had been advised by them that the arrests, if made, would be legal? Waters is not President or a justice of the Supreme Court. His private person may be of little importance. His office may not be the most important in the realm. But as a district attorney of the United States the law clothes his office with the same protection as that of the highest in the land. Persons are not to be lightly permitted to reduce the majesty of the United States government, whose officer Waters was, to the level of a carnival.

It seems clear that here the only intent necessary was that the defendants intended the natural consequences of their acts. The defendants knew Waters was the United States district attorney. They knew the arrest was taking place during his work day. They were "arresting" him for an alleged offense concerning the performance of his official duties. The court properly took the view that such questions as "Mr. Waters, what official duties could you have been performing at a bar luncheon?" were out of place. The court's forthright comment on such questions was more than justified. This answers the first specification of error.

One by one, reference is made to the remaining specifications as listed and this court's opinion thereon is tersely stated.[5]

2. *The specification that the defendants should have been permitted to introduce a certified copy of Judge Westover's opinion and to testify more fully that Judge Westover's oral opinion in releasing them from the contempt citation caused them to believe his restraining order was void.*

That opinion would have been admissible only if ignorance of the law were an excuse herein. The defendants were permitted to testify what they thought about the restraining order after hearing Judge Westover's oral opinion releasing them on the contempt charge.

3. *That the trial court erred in removing a certified copy of Judge Westover's opinion mentioned in "2" above, from the sheaf of papers, Exhibit "C", which one of the Finns waved at or exhibited to Waters when "arresting" him.*

The whole sheaf was admitted. Later the copy of that opinion was removed from the exhibit. It would appear that Exhibit "C" was a self-serving document prepared in advance by the Finns for the occasion. There was no duty to receive any part of the document in evidence. Therefore, removal of a portion was not prejudicial.

4. *That the court erred in rejecting radio-man Kennealy's testimony that he told the Finns he believed Judge Westover's restraining order was void.*

Ignorance of the law being no excuse herein, what Kennealy's legal opinion was is of no moment. And when ignorance of the law is an excuse, the court has the right to hold testimony concerning defendants' ignorance within reasonable limits.

5. *That the court erred in refusing to admit the contempt citation mentioned above and to allow defendants to testify that the restraining order of Judge Westover was the basis thereof.*

The trial court had already let the defendants testify too much about their civil and contempt litigation. See also answer to "4" above.

6. *The court should not have instructed the jury to disregard any statements attacking the validity of Judge Westover's restraining order.*

The instruction was proper. The order was still in force. The instruction does not tell the jury to disregard the defendants' statement that they thought the order was invalid.

7. *The court should not have told the jury that defendants could have moved to modify Judge Westover's restraining order.*

5. A summary of each specification, 2 to 24, is set forth in italics. The court's opinion thereon follows each in plain type.

**902**

It was the duty of the court to remove from the jury's speculation any question as to whether Judge Westover's order restraining defendants and others from moving the plane was a valid one.

8. *The court should not have instructed the jury that ignorance of the law was no excuse and should have instructed the jury it might be an excuse.*

This proposition has been answered elsewhere herein.

9. *The court gave inconsistent instructions about mistake of law and wilfulness.*

This ordinarily would be bad. But one instruction correctly stated the law. The other was too favorable to defendants. Therefore, no harm was done.

10. *The court erred on instructions about whether Waters had committed a crime and gave inconsistent instructions.*

There being no evidence that anyone committed a crime involving the Finns, the trial court gave too many instructions about what would have justified the Finns in arresting Waters and one or two instructions too favorable to them. The inconsistency of instructions is not fatal unless one of the inconsistent instructions errs wrongly against the defendants.

11. *The court's instruction on probable cause for arrest was wrong and defendants' instruction should have been given.*

No justifiable reason for the arrest was proved. The instruction given was too favorable to defendants.

12. *The court should have instructed the jury that reasonable force may be used in making an arrest.*

The proposition would be correct if the defendants had made any showing of a right to arrest Waters.

13. *The court erred in giving instructions that defendants had no right to arrest Waters for violating or conspiring to violate Federal Civil Rights, 18 U.S.C. Sections 242 and 371, and in refusing to define Sections 241 and 242.*

The points would be good if there were anything in evidence showing a right to arrest Waters.

14. *The court should not have instructed the jury as follows: "The importance of your duties requires that you consider the right of the Government of the United States to have its law properly executed, and that it is with you, citizens who are selected from this district, that finally rests the duty of determining the guilt or the innocence of those accused of crime, and unless you do your duty, the laws may just as well be stricken from the statute books."*

Taken out of context from the other instructions this seems to be too harsh according to some decisions of this court. But the language in the next paragraph of the instructions removes any objection there might otherwise be to the quoted language per se. The instructions have to be taken as a whole.

15. *The court should have given an instruction submitted by defendants with reference to the necessity of proving that defendants arrested Waters on account of his official duties.*

This was adequately covered by another instruction.

16. *The court should have instructed the jury that if the arrest was made in good faith believing Waters had committed a felony the defendants were not guilty of the conspiracy charge.*

The instruction might be appropriate if there were some evidence herein that someone other than the defendants had committed a crime.

17. *The court should have instructed the jury to acquit if the defendants arrested Waters in good faith believing he had exceeded his powers.*

What has been said hereinabove about arresting the President of the United States answers this point.

18. *The court should not have instructed the jury that evidence of any agreement between the Vineland school and defendants must be disregarded.*

The dealings of defendants with Vineland school had nothing to do with the

case. Those events happened long before Waters assumed office.

■ 19. *The court should have instructed the jury, in effect, that the government had to show at the very moment of arrest Waters was performing some official duty.*

Whether it would be a crime to arrest the United States attorney without proper cause while he is on vacation is not before the court. Here this court holds that it was enough to interfere with his duties that the arrest, with the surrounding facts, was made during the office hours of Waters within his district and on account of his past performance of his duties.

■ 20. *The court erred in its instructions that Judge Westover's restraining order being still in effect the jury should not concern itself with its validity and that it was the duty of Waters to follow the terms of the order; and that in the face of the order Waters could not have given up the plane.*

In view of all the evidence permitted from the defendants as to their good intentions it was important that the court instruct the jury just as it did with reference to these points.

■ 21. *The court erred in refusing instructions on the California law of claim and delivery.*

It would have been the worst kind of error to so instruct. The California law on this subject had nothing to do with the issues of the criminal case.

22. *The court erred in refusing an instruction concerning construction of evidence.*

The instruction offered probably was all right. However, the point is adequately covered by other instructions.

■ 23. *The court should have instructed the jury that the United States attorney is not immune from arrest.*

The United States attorney and every other citizen is immune from arrest unless there is a legal excuse for arresting him. No legal excuse for arresting Waters was ever shown here.

■ 24. *The court should have instructed the jury that no special credence is to be given to witnesses because of their connection with the United States government.*

The court's general instructions on witnesses were sufficient.

Ordinarily this court should make no reference to the conduct of a case by counsel, so long as the conduct is satisfactory. Here, however, counsel for appellants was kept in the case by this court against his wishes. Therefore, it should be noted that his efforts both before and after his attempt to withdraw were excellent. He brought up almost every point in behalf of defendants that anyone could conceive. His research was good and his persistence, within proper limits, was unabated.

But counsel had a situation where his clients, feeling themselves aggrieved against someone, had cheaply and brashly, in a spirit of anarchy, taken the law into their own hands. Certainly no just grievance against Waters was shown; and whether they have a just grievance, short of a felony, against someone else in the government is not the concern of this case. Only the self-control of Waters under the greatest of aggravations prevented the events at the Biltmore from reaching the atmosphere of a wrestling or prize ring. Herein the jury's verdict under the law upholds the dignity of the United States; not that of the individual person of Laughlin E. Waters.

The convictions are affirmed.

### On Petition for Rehearing

Before STEPHENS, CHAMBERS, Circuit Judges, and McLAUGHLIN, District Judge.

PER CURIAM.

The above named appellants were convicted of a crime in the United States District Court and sentenced to serve a penal term.

On the 7th day of January, 1955, the judgment of the District Court was affirmed by this court.

On the 3rd day of March, 1955, the appellants presented a Petition for Rehearing to a judge of this court, which presentation was subsequent to the issuance of the mandate in the case and subsequent to the date when the right to file the petition for rehearing had expired. The judge, not knowing that the mandate had been issued received the petition for filing, and the same has been filed by the clerk of the court.

We have examined the said petition and it is our opinion and we hold that the petition is devoid of merit. Therefore, we do not exercise our power to order sua sponte the mandate withdrawn, but in consideration of the circumstances order the petition stricken from the record.

Upon Motion for Order Withdrawing Mandate and Motion to Vacate Order to Surrender

Before DENMAN, Chief Judge, and STEPHENS and HEALY, Circuit Judges.

PER CURIAM.

The defendants-appellants have presented a petition to us in which they request that the mandate in the case heretofore issued be withdrawn in order for them to have the benefit of a motion for the issuance of the writ of certiorari to the Supreme Court of the United States. The petition which is in the form of an affidavit is inaccurate in many particulars. The defendants-appellants have acted in propria persona and for that reason have been given unusual consideration. Their time to ask for a rehearing after our affirmance of the judgment against them was extended and no effort to further extend it was made until two days before the last day. The petition was actually presented to us after the time had expired. Upon viewing the petition each judge who heard the appeal was of the opinion that it was without merit and the court struck it from the record.

The defendants-appellants are in need of a lawyer and we have time and again so advised them. Now, it seems they have placed themselves in a position which does not allow application to the Supreme Court. Out of consideration of the unusual circumstances we hereby order the mandate withdrawn and the defendants-appellants are hereby given Fifteen Days from the date hereof within which to file their petition for the writ of certiorari with the Supreme Court and that they be permitted to remain at large on their bond during such fifteen days and if within such time they file their petition for the writ with the Supreme Court, until the Supreme Court passes upon it.